SECOND DIVISION
June 30, 2010

No. 1-09-0357

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County. |
| | ) | |
| v. | ) | No. 90 CR 17373 |
| | ) | |
| SIDNEY SIMS, | ) | Honorable |
| | ) | Thomas P. Durkin, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE THEIS delivered the opinion of the court:

Following a jury trial, defendant was convicted of first degree murder and sentenced to 50 years' imprisonment. Defendant raises the following contentions on appeal: (1) he cannot obtain meaningful appellate review of his conviction and sentence where, through no fault of his own, the record on appeal is incomplete; (2) he has been denied his right to a speedy appeal; (3) the State made improper prejudicial remarks in closing argument; (4) the trial court relied on an improper factor in aggravation when it referred to the offense as "gang-related" and as an "execution"; and (5) the trial court imposed an excessive sentence. For all of the following reasons, we affirm defendant's conviction and sentence.

BACKGROUND

Defendant's conviction arose from the fatal shooting of Christopher Neuman in an alley at 122nd Street and Michigan Avenue in Chicago on June 24, 1990. Three eyewitnesses

identified defendant in connection with the offense. Defendant's theory at trial was misidentification.

I. Trial Proceedings

At trial, Levettia Johnson testified that on the evening of June 23, 1990, she was with her friend Tajegela Wilborn, when they ran into Neuman, whom she had known for two months. They all went for a ride in Neuman's car. At about 2:30 a.m., Neuman, Johnson and Wilborn drove to Neuman's grandmother's house at 122nd and Michigan. As they drove down 122nd Street, Johnson saw Quinton Madison, a longtime friend and neighbor of Neuman, motioning for Neuman to stop. Johnson also saw three other African-American men on the street standing by the alley. She had never seen them before that evening. Defendant was standing in the middle of the other two men. Johnson testified that Neuman then rode past Madison, stopped his car and went over to the three men to have a conversation. At some point Neuman was displaying his hands in an open palm position. He had nothing in his hands. Johnson remained in the car, sitting in the front seat on the passenger side. Wilborn was sitting in the backseat. The area was well lit from the street lights and homes.

Neuman had been speaking with the group of men for three to five minutes when Wilborn shouted to Johnson that "they had a gun" and to duck down in her seat. Johnson crouched down and heard about seven or eight shots being fired from the alley. She did not see any of the men with a gun and could not see who was shooting at that time. About two minutes later, Johnson raised her head and saw Neuman staggering, trying to get away. Later that day, Johnson identified defendant in a photographic array as the offender and then identified him

again the next day in a lineup.

Wilborn's testimony about the events leading up to the shooting was consistent with Johnson's testimony. She stated she did not know Neuman or defendant prior to that evening. She stated that when they drove down 122nd Street on their way to Neuman's grandmother's house, she heard Neuman refer to the three men standing on his block, questioning what they were doing there. Wilborn rested her head on the back of the rear seat and closed her eyes, while Neuman got out of the car to speak to the three men. At one point, Wilborn lifted her head, looked in the direction of the men, who were about 15 feet away from her in the alley, and saw one of the men wink at her. Wilborn then saw defendant, who was standing in the middle, draw his gun. He was holding the gun in both hands with his hands clasped together. She alerted Johnson, ducked down and heard about seven shots. She identified defendant as the shooter during a police lineup the next day. At trial, Wilborn identified defendant as the man who pulled out the gun.

Madison testified that he had known Neuman for about 12 years, they lived near each other and were friends. In the early morning hours of June 24, 1990, he was driving around his neighborhood with a friend, when he noticed a car in front of him with no license plate driving really slowly. There were five men in the car. Madison drove around the car and when he came back to his street, he saw the same car parked across the street from his house, and saw three men outside the car. He recognized defendant as someone that attended his high school. He was suspicious of the men because of the color clothing they wore, the way they wore their hats to the left, and because they were not from his neighborhood. As a result, Madison decided to remain

there, working on his car.

Shortly thereafter, Madison noticed Neuman's car approaching and attempted to stop and warn him of his suspicions, but Neuman continued past him. Madison was about 40 to 50 feet away from Neuman as he saw him talking to the men in the alley. Madison then saw defendant pull out a gun and shoot Neuman from about two to three feet away from him. Madison identified defendant in a photographic array that day and identified him again in a police lineup the next day. At the time of defendant's trial, Madison had plead guilty to robbery and was serving a five-year sentence for that offense. He denied having any agreement with the State's Attorney's office in exchange for his testimony.

Devon Patterson testified as an alibi witness on behalf of the defense. She had been dating defendant at the time of the occurrence for about three weeks. On June 23, 1990, at about 10:30 p.m., she was with defendant, her cousin Mackey Otis, and several friends including Dale Pierson, Lea Pierson, Tyrone Otis and Russel Cose. She and defendant later went to a park with Mackey Otis and Dale Pierson. They left the park at about 2 a.m. or 2:30 a.m. the following morning. Patterson acknowledged that she never reported that information to the police.

The jury found defendant guilty of first degree murder and he was sentenced to 50 years' imprisonment. At the close of defendant's sentencing hearing, defendant's trial counsel informed the court that he intended to represent defendant on appeal and filed a notice of appeal on July 15, 1992.

II. Procedural History

On August 24, 1992, defense counsel was notified that one volume of the common law

4

record had been prepared and certified by the clerk of the circuit court. On December 21, 1992, the chief deputy clerk of the circuit court notified defense counsel that the common law record had not yet been picked up. On March 3, 1993, this court dismissed defendant's appeal for want of prosecution for failing to "file the record in compliance with Supreme Court Rules." That dispositional order was filed in the trial court on May 21, 1993. The record additionally reflects that subsequently on September 16, 1993, defendant's trial counsel signed for and received the common law record.

Thereafter, on January 18, 1996, defendant filed a *pro se* petition for a "supervisory order" in the circuit court. Therein, he sought a copy of his common law record, police reports, and trial transcripts, indicating that he had repeatedly requested them from his trial counsel and from the clerk of the court to no avail. His petition was denied on February 23, 1996. Defendant subsequently filed a *pro se* motion in this court to reinstate his appeal, which was denied on October 12, 1999, and a *pro se* motion for leave to file a late petition for leave to appeal in the supreme court on December 20, 1999, which was denied on March 31, 2000. Therein, he indicated that he was informed for the first time in November 1994 that his appeal was dismissed for want of prosecution.

Thereafter, six years later, on March 24, 2006, defendant filed his *pro se* postconviction petition. Therein, he argued that: (1) he had newly discovered evidence demonstrating his actual innocence; (2) his due process rights were violated when a State witness testified falsely at trial; and (3) he received ineffective assistance of trial and appellate counsel for various reasons, including the failure to perfect his direct appeal. The trial court summarily dismissed the petition

as frivolous and patently without merit. On appeal[1], we held that pursuant to People v. Ross, 229 Ill. 2d 255 (2008), trial counsel's failure to perfect the direct appeal was substandard and presumptively prejudicial. We remanded for further proceedings consistent with the Act.

On remand, the trial court granted defendant leave to file a late notice of appeal. Thereafter, the State Appellate Defender representing defendant on appeal filed a motion to certify a bystander's report pursuant to Supreme Court Rule 323(c). 210 Ill. 2d R. 323(c). Therein, counsel represented that upon review of defendant's case, the transcript from the *voir dire*, and the original common law record which included the motion for a new trial and the presentence investigation report were irretrievably lost and could not be recreated.

In support, counsel attached affidavits from: (1) Janet O. Davis, the court reporter responsible for reporting the proceedings at defendant's trial on April 30, 1992, indicating that she was unable to find the notes from the proceedings and that they were unavailable for transcription; (2) Gale Paradise, public information officer with the Cook County Adult Probation Department, indicating that presentence investigation reports are destroyed after three years and therefore her office no longer had defendant's report; (3) Thomas P. Durkin, the now-retired judge who presided over the trial and sentencing, indicating that he had no notes, documents or independent recollection of the proceedings; (4) Chester Slaughter, trial counsel, indicating that he had no notes, documents, exhibits or independent recollection of the proceedings; (5) Michael D. Krejci and Thomas Joseph Hennelly, former assistant State's

---

[1] Defendant indicates that during the pendency of his appeal, on July 24, 2007, the Illinois Supreme Court denied his motion for a supervisory order to reinstate his direct appeal.

Attorneys assigned to defendant's trial and sentencing, indicating that they had no notes, documents or exhibits from the proceedings. Krejci further indicated that he had no independent recollection of the jury selection proceedings.

Additionally, counsel attached an affidavit from defendant, indicating that he was questioned by the probation officer about his gang affiliation, which he denied, his education history, his parents, and lack of criminal history. He also noted that the judge indicated he would select the jury, that he shuffled the jury selection cards and asked whether the prospective jurors ever committed a crime and whether they were ever a victim of a crime. Other than these facts, he had no notes, documents or independent recollection of the trial. The trial court certified the bystander's report concluding that the missing records were irretrievably lost and could not be recreated.

ANALYSIS

Defendant contends that he has been denied his right to meaningful appellate review as a result of an incomplete record and, therefore, maintains that he is entitled to a new trial. There is no *per se* rule in Illinois that if a transcript or other evidence from the trial or sentencing is missing from the record on appeal, the defendant is automatically entitled to a new trial. See, *e.g.*, People v. Houston, 226 Ill. 2d 135, 152 (2007) (mere failure to record *voir dire* does not necessarily require a remand to reconstruct proceedings); People v. Banks, 378 Ill. App. 3d 856, 864 (2007) (missing videotape did not entitle defendant to a new trial); 210 Ill. 2d R. 323(c) (provides for alternative methods for obtaining a report of proceedings such as supplementing the record with a bystander's report "from the best available sources, including recollection").

7

Generally, a defendant is obligated to provide a sufficiently complete record for appellate review of his specific claims, and absent such record, it will be presumed that the court heard sufficient evidence and argument to support its decision. Banks, 378 Ill. App. 3d at 861.

Nevertheless, this rule has been relaxed in circumstances where the defendant has established: (1) a lack of fault in providing the incomplete record; and (2) that the missing record is material to a meaningful review of the contentions raised on appeal. People v. Stark, 33 Ill. 2d 616, 621 (1966); People v. Appelgren, 377 Ill. App. 3d 137, 142-43 (2007); Banks, 378 Ill. App. 3d at 866-67; People v. Ramos, 295 Ill. App. 3d 522, 526-27 (1998).

If the defendant bears no fault and the evidence is material, the court considers whether other means are available to afford adequate review. Houston, 226 Ill. 2d at 151 (ineffective assistance of counsel claim involving failure to record *voir dire* remanded for a hearing to attempt to reconstruct *voir dire* record where defendant attempted to raise the claim in the trial court); Stark, 33 Ill. 2d at 622 (remand to reconstruct suppression hearing where essential to adequate review of issues raised at the hearing); People v. Martinez, 361 Ill. App. 3d 424, 430 (2005) (the defendant could have filed a bystander's report of an isolated hearing to remedy gaps in the record); Appelgren, 377 Ill. App. 3d at 144-45 (adequate alternative to missing tape not available to afford adequate review of harassment by telephone conviction). Whether a defendant has been denied meaningful review as a result of an incomplete record is a question of law, which is reviewed *de novo*. Appelgren, 377 Ill. App. 3d at 140.

Here, it is undisputed that the transcript of jury selection is missing through no fault of defendant due to the court reporter's lost notes. It is also undisputed that the circuit court

certified that it cannot be reconstructed through a bystander's report or agreed statement of facts. However, defendant has failed to establish that the missing records are material to a meaningful review of his appeal. In establishing whether the missing evidence is material, several courts have examined whether defendant has shown a "colorable need" for the evidence. See, *e.g.*, Applegren, 377 Ill. App. 3d at 144 (missing audiotape was crucial to assessing tone of voice in defendant's reasonable doubt claim on a conviction for harassment by telephone); Ramos, 295 Ill. App. 3d at 526 (colorable need established where entire trial transcript was missing and defendant challenged the sufficiency of the evidence); Banks, 378 Ill. App. 3d at 867 (defendant failed to articulate a colorable need for a missing videotape where he could not even assert a *prima facie* showing that it was material to the points raised on appeal). See also Houston, 226 Ill. 2d at 152 (court remanded for a reconstruction hearing where defendant had attempted to raise a *voir dire* claim in the trial court).

Here, with respect to the *voir dire*, defendant merely argues that due to the missing transcript he is precluded from raising a claim related to this portion of his trial. Other than stating the obvious that "reversible error can occur during this process," citing Batson v. Kentucky, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), and People v. Zehr, 103 Ill. 2d 472 (1984), defendant provides no specific context to this argument relative to his trial. He concludes that "it is impossible to ensure that the selection of [his] jury was constitutionally sound." He offers nothing in his affidavit that would remotely establish a need for these transcripts, nor has he ever even articulated any prejudice with regard to his specific jury.

We further reject defendant's assertion that it would be unreasonable to place the burden

9

on him or his appellate counsel to assert "specific improprieties" that occurred during *voir dire* given that he was a 21-year-old layman and that the posttrial motion is also missing. Defendant must assert some basis for further consideration. For example, in Houston, the defendant appealed his conviction and sentence arguing his trial counsel was ineffective for waiving the court reporter during *voir dire*. Houston, 226 Ill. 2d at 140-41. The 18-year-old defendant established some basis in the record for further consideration of this issue where he had complained about the composition of his jury by filing a *pro se* motion for a new trial. He maintained that he felt that there was a discriminating pattern in jury selection. Houston, 226 Ill. 2d at 145-46. In the present case, defendant has not asserted any claim of error with regard to his jury. The record also reflects that defendant filed a *pro se* motion for a new trial asserting his actual innocence, but never raised any issue regarding the composition of his jury at that time or any time thereafter.

It is not enough to say that as a result of the missing records we do not know whether any error occurred or whether appellate counsel was ineffective. "We will not engage in blatant conjecture as to some possible value a transcript of these *** proceedings might have to defendant." People v. Wilson, 32 Ill. App. 3d 57, 61 (1975), *rev'd on other grounds*, 66 Ill. 2d 346 (1977). Accordingly, it cannot be said that the transcript of *voir dire* is material to a meaningful review of defendant's claims.

Nor can it be said that the presentence investigation report is material to a meaningful review of defendant's excessive sentence claim. Initially, defendant makes no argument other than the conclusory statement that "review of [his] sentence is fundamentally impaired due to the

loss of [the report]." This conclusory argument is belied by the record. The transcript from the sentencing hearing reflects that trial counsel addressed the mitigating factors presented in the report (PSI) and defendant does not argue that trial counsel failed to articulate any particular mitigating factors. It is also evident that the trial court had an opportunity to view the PSI report at the time of sentencing and considered any mitigating factors presented in the report. The record also establishes that the trial court offered defendant the right of allocution, which defendant declined. Thus, defendant's claim that the PSI report is material to a meaningful review of his excessive sentence claim is entirely conclusory and speculative. Accordingly, defendant is not entitled to a new trial as a result of the missing records on appeal.

We next address defendant's related contention that due to the extensive delay in obtaining his direct appeal, he was denied his due process right to a speedy appeal. In Illinois, a defendant's right to appeal his conviction is provided by the Illinois Constitution. Ill. Const., 1970, art. VI, §6. Where a state provides for an appeal of right, "the procedures used in deciding appeals must comport with the demands of the Due Process *** Clause[] of the [U.S.] Constitution." Evitts v. Lucey, 469 U.S. 387, 393, 83 L. Ed. 2d 821, 827-28, 105 S. Ct. 830, 834 (1985).

In determining whether a delay of an appeal violates due process, this court has previously followed other state and federal courts in relying upon the analytical framework established in Barker v. Wingo, 407 U.S. 514, 33 L. Ed. 2d 101, 92 S. Ct. 2182 (1972), designed to address alleged violations of an individual's sixth amendment right to a speedy trial. People v. Sistrunk, 259 Ill. App. 3d 40, 53-54 (1994) (and cases cited therein). The four-factor test set

forth in <u>Barker</u> includes: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's responsibility to assert his right; and (4) the resulting prejudice to the defendant. <u>Barker</u>, 407 U.S. at 530, 33 L. Ed. 2d at 116, 92 S. Ct. at 2192. These factors should be considered in balance with and not inconsistent with the rights of public justice. <u>People v. Kaczmarek</u>, 207 Ill. 2d 288, 295 (2003) (considering the <u>Barker</u> factors in a speedy trial case).

The State concedes that we should follow this analytical framework in assessing defendant's speedy appeal claim. Assuming that defendant has a due process right to a speedy appeal, and that our supreme court would apply the <u>Barker</u> factors to analyze the claim, we find that defendant has made a threshold showing that the 17-year delay necessitates further inquiry into the other factors. <u>Barker</u>, 407 U.S. at 530, 33 L. Ed. 2d at 117, 92 S. Ct. at 2192 (length of delay is "to some extent a triggering mechanism").

With respect to the reason for the delay and defendant's responsibility, we acknowledge that the initial delay was due to the ineffective assistance of counsel in perfecting his direct appeal in 1993. Nevertheless, defendant was aware that his appeal had been dismissed for want of prosecution at least by November 1994. The record is silent as to any effort made by defendant between that time and 1996 when he made a request for his records. The record on appeal is also silent as to any action taken between 1996 when the trial court denied his record request and 1999, when he first filed a motion seeking to reinstate his appeal. Defendant filed a petition in the supreme court in 2000, but then did nothing to assert his rights for another six years until 2006. Where defendant knew of his ineffective assistance claim in 1994, but never availed himself of the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2006)) until

2006, he bears some responsibility for the delay in pursuing his rights. See Kaczmarek, 207 Ill. 2d at 296 ("A delay is considered to have been occasioned by the defendant when the defendant's acts caused or contributed to the delay").

Additionally, we find that defendant was not prejudiced by the delay in this case. Initially, we reject defendant's assertion that the length of the delay creates a presumption of prejudice. Rather, "it simply marks the point at which courts deem the delay unreasonable enough to trigger the full Barker inquiry." Kaczmarek, 207 Ill. 2d at 295. Defendant further argues that the delay has: (1) impaired his grounds for appeal and ability to present a defense in the event of a retrial; (2) resulted in oppressive incarceration; and (3) caused undue anxiety and concern.

As discussed, we have already held that the lost records did not impede defendant's right to meaningful appellate review of his claims. Further, because we find no basis to conclude that the outcome would have been different had his appeal been perfected earlier, there is no need to further address his ability to present a defense on retrial. Sistrunk, 259 Ill. App. 3d at 55. We additionally reject defendant's assertion that his incarceration was oppressive where there was ample evidence to support his conviction, and a thorough review of his claims, as will be addressed below, reveals no grounds for reversal. Defendant has merely been serving his sentence as mandated by law.

Although defendant may have undoubtedly experienced anxiety and concern during the pendency of the delay, such emotion is present to some extent in every case and absent some unusual showing, this inconvenience alone is of slight import. See Kaczmarek, 207 Ill. 2d at

13

300. Accordingly, although the delay between his conviction and appeal was indeed lengthy, defendant bears some responsibility for contributing to the delay and has not established actual resulting prejudice in his ability to prosecute his appeal. Therefore, considering the relevant factors, defendant's right to a speedy appeal was not violated.

We next address defendant's contentions regarding prosecutorial misconduct in closing argument. Specifically, defendant argues that the prosecutor denied him a fair trial when he: (1) suggested that the State's witnesses were afraid of defendant and vouched for their credibility; (2) suggested the offense was gang-related; and (3) misstated the evidence and characterized defendant as an animal. Defendant additionally maintains that, taken together, these comments denied him a fair trial.

Defendant concedes that he failed to preserve this issue for review since he did not object to the complained-of remarks during the trial. People v. Herron, 215 Ill. 2d 167, 175 (2005). Nevertheless, he urges this court to review the issue pursuant to the plain error exception to the forfeiture rule or alternatively as an ineffective assistance of counsel claim.

The plain error doctrine permits a reviewing court to bypass normal forfeiture principles and consider unpreserved error in two circumstances: where "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." People v. Piatkowski, 225 Ill. 2d 551, 565 (2007). However, before invoking the

14

plain error exception, it is appropriate to determine whether error occurred at all, because without error, there can be no plain error. People v. Bannister, 232 Ill. 2d 52, 65 (2008).

It is generally improper for a prosecutor to vouch for the credibility of a witness or to express a personal opinion about the case. People v. Johnson, 114 Ill. 2d 170, 198 (1986); People v. Wilson, 199 Ill. App. 3d 792, 795-96 (1990). However, the prosecutor may properly comment on the evidence presented or reasonable inferences drawn from that evidence, respond to comments made by defense counsel which clearly invite response, and comment on the credibility of witnesses. People v. Moss, 205 Ill. 2d 139, 184 (2001); People v. Hall, 194 Ill. 2d 305, 346 (2000). In reviewing whether comments made during closing argument are proper, courts must view the closing argument in its entirety and remarks must be viewed in context. People v. Johnson, 218 Ill. 2d 125, 141 (2005). With these rules in mind, we consider defendant's claims of error.

Here, defendant complains that the prosecutor told the jury that it was "not easy" for Johnson and Wilborn to testify, that the witnesses "did their responsibility" and "fulfilled their duty as citizens in their community." He further complains about the prosecutor's comment that, "it's hard to come in here and point and say yes, this man is a murderer," and "[t]hey took an oath to tell the truth and they did tell the truth and they have to go back out there and live in that area, ladies and gentlemen and that the only thing that's protecting [*sic*] is the truth."

The record does not reflect that the prosecutor was expressing his personal belief in the witnesses' veracity. Rather, the prosecutor's remarks were prefaced by the evidence the jury would be instructed to consider regarding the soundness of the identification and the evidence

15

that made the witnesses' observations credible.  The prosecutor's remarks were also prefaced by the statement, "you saw their demeanor from the witness stand and you saw those young girls testify."  This was a fair comment on the credibility of the witnesses in light of their demeanor and the evidence presented.  See People v. Nolan, 291 Ill. App. 3d 879, 886 (1997); People v. Collins, 265 Ill. App. 3d 568, 582 (1994) (prosecutor's remark that witness testified to the truth was proper where based on the jury's observation of her demeanor and testimony).  Accordingly, when taken in proper context, and viewed in their entirety, these remarks did not exceed the bounds of proper comment.

With respect to defendant's claim regarding fear of testifying, it is improper for the State to suggest that a witness was afraid to testify because the defendant threatened or intimidated him when that argument is not based on evidence produced at trial.  People v. Mullen, 141 Ill. 2d 394, 405 (1990).   Here, defendant complains of the prosecutor's remark to the jury that, "[y]ou think these girls were happy to come in here [?]  You saw the tears in their eyes.  They were scared to death.  They were scared to death because they've seen what this man has done."  This isolated comment was, in part, reflecting on the demeanor of the witnesses and was not highlighted, repeated or otherwise emphasized.  See People v. Walker, 230 Ill. App. 3d 377, 402 (1992) (no prejudice in remark that witness was risking his life to testify where remarks were not overemphasized).

Nor do we find error in the description of the murder as an "assassination" or the statement that defendant "was laying [sic] in [wait] looking and looking at an [sic] animal waiting for his prey because you know that car was parked there in front of his house for a

16

reason. And they stalked and they shot him." Initially, we find the term "assassination" was not an inappropriate characterization here in reference to the action taken by defendant. The evidence supports that this was a surprise attack. Neuman was unarmed, having a conversation with defendant when defendant suddenly clasped his hands together around his gun and shot Neuman at point-blank range numerous times. See People v. Nicholas, 218 Ill. 2d 104, 122 (2005) (prosecutor's reference to defendant as "pure evil" was not improper where term referred to specific actions taken by defendant). Nor do we find that the prosecutor's remarks improperly equated defendant with an "animal." When these isolated remarks about the victim as prey and lying in wait are viewed in their entirety and in context, we find the references did not exceed the bounds of fair comment on the action taken by defendant in this case.

Defendant also argues that the prosecutor's statement, that defendant and his companions did not "belong" in the neighborhood, were wearing their hats to a different side, and were wearing red and black, was made for the sole purpose of implying that the offense was gang-related. The evidence regarding the color of the clothing and direction of the hat was relevant and admissible at trial to strengthen the witness's identification testimony. People v. Gonzalez, 142 Ill. 2d 481, 488 (1991). Nevertheless, we agree that the prosecutor then suggested that the jury could consider the evidence for an improper purpose by stating "use your common sense. You know what's going on." See People v. Smith, 141 Ill. 2d 40, 58 (1990) (gang-related evidence would only be admissible to show motive where there is sufficient proof that it is related to the crime charged).

However, to the extent that any of these remarks could be deemed error, defendant

17

cannot satisfy either prong of the plain error doctrine. Contrary to defendant's assertion, the evidence presented at trial was not closely balanced. Although defendant presented an alibi from his girlfriend, three eyewitnesses linked defendant to the crime. Madison viewed the shooting in its entirety from close range, his attention was focused on defendant, he immediately identified defendant within hours of the crime and never wavered from his certainty. Additionally, two other witnesses present at the scene, both within close range of defendant, corroborated his identification within hours of the shooting and also never wavered from their certainty. See Piatkowski, 225 Ill. 2d at 567.

Nor has defendant satisfied his burden to establish that the improper remarks were "so serious that [they] affected the fairness of the defendant's trial and challenged the integrity of the judicial process." Herron, 215 Ill. 2d at 187. With respect to the improper inference from the statement, "you know what's going on," we do not believe this isolated reference was so inflammatory that it denied defendant a fair trial. People v. Easley, 148 Ill. 2d 281, 332-33 (1992); see also Gonzalez, 142 Ill. 2d at 491 (ambiguous reference to jurors not living in a vacuum and knowing what happens in the streets of the city did not deny defendant a fair trial). With respect to the other remarks, the jury was admonished to consider the evidence and the reasonable inferences that could be drawn therefrom and that any argument made in closing argument which was not based on the evidence should be disregarded. We do not believe that these isolated comments made by the State during argument would cause the jury to ignore the clear instructions given to it by the court as to the proper course of its deliberations. People v. Glasper, 234 Ill. 2d 173, 214 (2009); Nicholas, 218 Ill. 2d at 122-23. Accordingly, we decline to

apply the plain-error exception to the forfeiture rule with regard to these remarks.

Nor do we find that defendant has demonstrated a pattern of prosecutorial misconduct which requires a new trial. As we have already concluded, the evidence in this case was not closely balanced, and any errors committed by the prosecutor did not render the trial unfair. Glasper, 234 Ill. 2d at 215.

Lastly, we reject defendant's argument that he was denied the effective assistance of counsel based on counsel's failure to object to the remarks challenged by defendant on appeal. Where we have concluded that the remarks did not deprive defendant of a fair trial, defendant cannot demonstrate that there was a reasonable probability that the outcome of the trial would have been different, as required by Strickland v. Washington, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984).

Next, we consider defendant's contentions regarding sentencing. Specifically, defendant argues that the trial court relied upon improper factors in aggravation when he characterized the murder as having been done in an "execution fashion," and as "gang-related activity."

Initially, we recognize that despite defendant's failure to file a motion to reduce his sentence, defendant has not forfeited review of matters relating to his sentence. At the time he was sentenced in 1992, the relevant statute did not mandate that such a motion was required. Ill. Rev. Stat.1989, ch. 38, par. 1005-8-1(c); see also People v. Lewis, 158 Ill. 2d 386, 390-91 (1994) (superceded by statute as stated in People v. Reed, 177 Ill. 2d 389 (1997)). Accordingly, we review this claim for error.

With respect to the trial judge's reference to the crime as being done in an execution

19

style, the trial court may consider the manner in which the victim's death was brought about, as well as the seriousness, nature, and circumstances of the offense, including the nature and extent of each element of the offense. People v. Saldivar, 113 Ill. 2d 256, 271-72 (1986). The reference was a fair characterization of the circumstances and the senseless nature of defendant's brutal and unprovoked attack.

With respect to the reference to defendant's actions as "gang-related activity," we note that at sentencing, the ordinary rules of evidence are relaxed. People v. Bouyer, 329 Ill. App. 3d 156, 165 (2002). Evidence maybe admitted so long as it is both relevant and reliable. People v. Harris, 375 Ill. App. 3d 398, 408 (2007). The source and type of admissible information is virtually without limits. People v. Rose, 384 Ill. App. 3d 937, 940-41 (2008). A court " 'may search anywhere, within reasonable bounds, for other facts which tend to aggravate or mitigate the offense.' " People v. La Pointe, 88 Ill. 2d 482, 495 (1981), quoting People v. McWilliams, 348 Ill. 333, 336 (1932). Specifically, a court may inquire into a defendant's "general moral character, habits, social environment, abnormal tendencies, age, natural inclination or aversion to commit crime, and stimuli motivating his conduct, in addition to his family life, occupation, and criminal record." People v. Reed, 376 Ill. App. 3d 121, 128 (2007). The court may consider defendant's credibility, demeanor and character. People v. Streit, 142 Ill. 2d 13, 19 (1991).

Here, there was some evidence to support the court's conclusion that defendant was a gang member, but this evidence alone was insufficient to establish the relevance of this fact in relation to the murder. Accordingly, it was improper for the court to consider it in aggravation. People v. Zapata, 347 Ill. App. 3d 956, 966 (2004). Nevertheless, unlike Zapata, here, the

20

improper reference was not the dominant factor in sentencing defendant. We are mindful that a reviewing court should not focus on a few words or statements made by the trial court, but must consider the record as a whole. Reed, 376 Ill. App. 3d at 128. The comment was made in the greater context of evaluating the nature and seriousness of the offense and the need to deter this type of execution-style violence. Accordingly, we find no reversible error.

Lastly, defendant contends that the circuit court imposed an excessive sentence where it failed to reflect his young age, his potential for rehabilitation, and lack of criminal background. The trial court's determination as to the appropriate punishment is entitled to great deference and will not be altered absent an abuse of discretion. People v. Jones, 168 Ill. 2d 367, 373-74 (1995). We may not substitute our judgment for that of the trial court merely because we may have weighed the sentencing factors differently. Streit, 142 Ill. 2d at 19. The seriousness of the offense or the need to protect the public may outweigh mitigating factors and the goal of rehabilitation. People v. Gagliani, 251 Ill. App. 3d 1019, 1029 (1993). Even where there is evidence in mitigation, the court is not obligated to impose the minimum sentence. People v. Madura, 257 Ill. App 3d 735, 740-41 (1994).

Applying these principles to the present case, we find that the trial court did not abuse its considerable discretion in imposing a sentence 10 years less than the statutory maximum term for first degree murder. The record reveals that defense counsel articulated and the court considered the mitigating factors, including defendant's rehabilitative potential, his young age, that although defendant had prior arrests, he had no prior convictions, and he attended high school. Nevertheless, the trial court found that this was far from a minimum-term case given the cold-

blooded nature of the crime and the evidence that defendant fired several shots into an unarmed victim at close range in a residential area. Additionally, the court could consider defendant's lack of remorse in that he declined his right of allocution. People v. Mulero, 176 Ill. 2d 444, 462 (1997) (a defendant's lack of remorse is a proper subject for consideration at sentencing). Although defendant emphasized the factors in mitigation, the trial court was not obligated to place greater weight on these factors than on the need to deter others from committing similar senseless crimes.

Accordingly, for all of the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

HOFFMAN, J., concurs.

CUNNINGHAM, P.J., specially concurs.

1-09-0357

PRESIDING JUSTICE CUNNINGHAM, specially concurring:

I concur with the result reached by the majority. Nevertheless, I am compelled to comment on whether the defendant's right to a speedy trial was violated, given the extensive amount of time which passed between the time of the defendant's conviction and the perfection of his appeal to this court. It should be noted that speedy trial in the context of this appeal refers only to the perfection of the appeal before this court. The majority concludes that the defendant's right to a speedy trial was not violated because he failed to act once he determined that his appellate counsel had not perfected the appeal and that the appeal had later been dismissed for want of prosecution. The defendant was an unsophisticated inmate who did not have unfettered access to the normal tools of communication, legal research nor the legal acumen necessary to effectuate a timely remedy for his appellate counsel's short comings. I would find that given his circumstances, the defendant acted reasonably and timely within the bounds of the tools available to him to bring about perfection of his appeal. In my opinion, the 17 year delay in prosecuting this appeal was significantly the fault of others and not the defendant. Therefore, I believe that the defendant's right to a speedy trial, as related to the prosecution of his appeal, was impaired. The relevant inquiry is whether the defendant was prejudiced by that impairment. I am not aware of any precedent which would automatically entitle the defendant to a new trial upon violation of his right to a speedy trial in this context, ie., perfection of an appeal. Thus, the answer to the inquiry regarding whether the defendant suffered prejudice as a result of the delay must be the determinative factor in whether the defendant is entitled to a new trial. Like the majority, I do not believe there is any evidence to suggest that the defendant was materially harmed by the

23

delay of his appeal. As the majority notes, "defendant may have []experienced anxiety and concern during the []delay." But I agree with the majority that "this emotion is present to some extent in every case." In summary, I believe that the defendant's right to a speedy appeal was violated but I do not believe that the defendant suffered any prejudice as a result of that delay.

# REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT

## THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

v.

## SIDNEY SIMS,

Defendant-Appellant.

## <u>No. 1-09-0357</u>

**Appellate Court of Illinois**
**First District, Second Division**

**Filed: June 30, 2010**

## <u>JUSTICE THEIS delivered the opinion of the court.</u>

**Hoffman, J., concurs, and Cunningham, P.J., specially concurs.**

**Appeal from the Circuit Court of Cook County**
**Honorable Thomas P. Durkin, Judge Presiding**

| | |
|---|---|
| **For PLAINTIFF-**<br>**APPELLANT:** | **Michael J. Pelletier, State Appellate Defender**<br>**Patricia Unsinn, Deputy Defender**<br>**Carolyn R. Klarquist, Assistant Appellate Defender**<br>**Office of the State Appellate Defender**<br>**203 North LaSalle St. - 24th Floor**<br>**Chicago, IL 60601** |
| **For DEFENDANT-**<br>**APPELLEE:** | **Anita Alvarez, State's Attorney**<br>**Alan J. Spellberg, Asst. State's Attorney**<br>**Samuel Shim, Asst. State's Attorney**<br>**Manny Magence, Asst. State's Attorney**<br>**Cook County State's Attorney's Office**<br>**Richard J. Daley Center - Room 309**<br>**Chicago, IL 60602** |